## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-CR-00189-GKF |
| | ) | |
| JACOB WILLIAM PAUL COOMBES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the court on the Motion to Dismiss the Indictment for Failure to State an Offense [Doc. 15] of defendant Jacob William Paul Coombes. For the reasons set forth below, the motion is denied.

### I.      Background/Procedural History

On April 22, 2014, Mr. Coombes was convicted of Burglary in the Second Degree pursuant to Okla. Stat. tit. 21, § 1435, and Grand Larceny in a House or Vessel pursuant to Okla. Stat. tit. 21, § 1707, case no. CF-2013-00328A filed in the District Court in and for Ottawa County, State of Oklahoma. [Doc. 2]. Under Oklahoma law, Burglary in the Second Degree and Grand Larceny in a House or Vessel are each felonies, punishable by a term of imprisonment exceeding one year. *See* Okla. Stat. tit. 21, §§ 1436(2), 1707.

On June 21, 2022, a grand jury returned an Indictment charging Mr. Coombes with one count of Felon in Possession of a Firearm and Ammunition pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(2). [Doc. 2]. Section 922(g)(1) provides as follows: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). The Indictment alleges that Mr. Coombes, knowing that he had previously

been convicted of crimes punishable by imprisonment for terms exceeding one year, knowingly possessed a Glock, receiver model unknown, .45 caliber pistol, serial number obliterated, barrel marked serial number ELY808 and seven rounds of ammunition.  [Doc. 2].

Mr. Coombes seeks to dismiss the Indictment, arguing that 18 U.S.C. § 922(g)(1) is unconstitutional in the wake of the United States Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022).  [Doc. 15].  Specifically, Mr. Coombes contends that § 922(g)(1) is impermissible under the Second Amendment to the United States Constitution.  The government filed a response in opposition. [Doc. 17].  Mr. Coombes filed a reply.  [Doc. 18].  On August 3, 2022, the court heard oral argument on the motion.  [Doc. 19].  At the close of the hearing, counsel for the government requested supplemental briefing, which the court granted.  [*Id.*].

On August 17, 2022, the government filed its Supplemental Response in Opposition to the Motion to Dismiss the Indictment.  [Doc. 31].  Mr. Coombes filed a Supplemental Brief in Support of His Motion to Dismiss the Indictment [Doc. 35], and the government filed a Supplemental Reply.  [Doc. 37].  The briefing is now closed and the motion is ripe for the court's determination.

## II. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)

Prior to considering the parties' arguments, it is necessary to understand the *Bruen* decision.  In *Bruen*, the Court considered a constitutional challenge to New York's firearm licensing regime, which required a person seeking to carry a firearm outside of the home to demonstrate that "proper cause exists" to issue the license.  *Bruen*, 142 S. Ct. 2122-23 (citing N.Y. Penal Law Ann. § 400.00).  The statute did not define "proper cause," but New York courts interpreted the standard to require the applicant to "demonstrate a special need for self-protection distinguishable from that of the general community."  *Bruen*, 142 S. Ct. at 2123 (citing *In re*

*Klenosky v. N.Y.C. Police Dep't,* 428 N.Y.S.2d 256, 257 (1980)).

In considering the constitutionality of the New York licensing regime, the Court first cited its prior holdings in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense," and noted that, "[i]n the years since, the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen,* 142 S. Ct. at 2125.  Pursuant to that framework, at the first step, the government bore the burden to "justify its regulation by 'establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood.'" *Id.* at 2126 (quoting *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019)). If "the regulated conduct f[ell] beyond the Amendment's original scope," then the analysis ended. *Bruen*, 142 S. Ct. at 2126.  However, if the historical evidence was inconclusive or the regulated conduct was not categorically excluded, courts proceeded to the second step, which generally involved analysis of "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (quoting *Kanter*, 919 F.3d at 441).  If a "core" Second Amendment right was burdened, courts applied "strict scrutiny," requiring the government to prove the law "[was] narrowly tailored to achieve a compelling governmental interest." *Bruen*, 142 S. Ct. at 2126.  "Otherwise, they appl[ied] intermediate scrutiny and consider[ed] whether the Government c[ould] show that the regulation [was] 'substantially related to the achievement of an important governmental interest.'" *Bruen,* 142 S. Ct. at 2126 (quoting *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012)).

In rejecting the two-part means-ends test, the Court characterized it as "one step too many." *Bruen*, 142 S. Ct. at 2127.  The Court noted that, while step one "is broadly consistent with *Heller*,

which demands a test rooted in the Second Amendment's text, as informed by history," the second step was inconsistent with its prior decisions in *Heller* and *McDonald*. *Bruen*, 142 S. Ct. at 2127. Instead, the Court articulated the relevant inquiry succinctly: "[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* The Court went on to expound on the analysis, stating,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2129-30. Thus, the test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

To determine whether a firearms regulation is "consistent with the Nation's historical tradition of firearm regulation," district courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." *Id.* at 2131-32. The inquiry will often require "reasoning by analogy." *Id.* at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar,'" including both in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. Because self-defense lies at the core of the Second Amendment, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Bruen,* 142 S. Ct. at 2133 (emphasis in

original) (quoting *McDonald*, 561 U.S. at 767).  Significantly, however, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Bruen,* 142 S. Ct. at 2133 (emphasis in original).

Further, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen,* 142 S. Ct. at 2136.  This is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."  *Bruen,* 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in original).  But the Court acknowledged that subsequent history may be relevant to the inquiry as "'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in the Constitution." *Bruen,* 142 S. Ct. at 2136 (quoting *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020)).  However, "to the extent later history contradicts what the text says, the text controls." *Bruen,* 142 S. Ct. at 2137.  Applying these principles, the Court concluded that the New York licensing regime was unconstitutional in that it "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Bruen,* 142 S. Ct. at 2156.

### III.   Facial Challenge

Mr. Coombes argues both that § 922(g)(1) is facially unconstitutional and unconstitutional as applied to him.  The court first considers Mr. Coombes' facial challenge.

### A.   Presumptive Application of the Second Amendment

Pursuant to *Bruen,* the court first considers whether the Second Amendment's plain text covers Mr. Coombes' conduct.  If so, "the Constitution presumptively protects [his] conduct." *Bruen,* 142 S. Ct. at 2129-30.

The Second Amendment to the U.S. Constitution provides as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed." U.S. CONST. amend. II. The government contends that, as a felon, Mr. Coombes does not fall within the scope of "the people" and therefore the plain text of the Second Amendment is inapplicable.

The Constitution does not define "the people" or "right of the people." However, the same phrase appears to enumerate individual rights in the First Amendment's Assembly-and-Petition Clause, U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."); and the Fourth Amendment's Search and Seizure Clause, U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."). Further, the Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by *the people*." U.S. CONST. amend. IX. *See Heller,* 554 U.S. at 579 (emphasis added). In these contexts, "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller,* 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Thus, in *Heller*, the Court concluded that courts must begin any constitutional analysis with "a strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." *Heller*, 554 U.S. at 581 (emphasis added). It is undisputed that Mr. Coombes is an American citizen who has resided in the United States his entire life. Thus, pursuant to *Heller*, the Second Amendment's right to bear arms presumptively applies to Mr. Coombes as an American and member of the national community.

The government urges this court to adopt an interpretation of "the people" that excludes convicted felons. However, pursuant to the presumption of consistent usage, "[a] word or phrase

is presumed to bear the same meaning throughout a text." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 170 (2012).[1]  And the Court's interpretation of the phrase "right of the people" in *Heller* strongly supports application of the interpretive presumption to the First, Second, and Fourth Amendment's reference to "the people." *See Heller,* 554 U.S. at 580.

The Fourth Amendment clearly applies to convicted felons. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("[W]e have held that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.").  Likewise, although convicted felons may be disenfranchised from the First Amendment right to vote, if a state opts not to do so, the First Amendment applies.[2]  *See Kanter,* 919 F.3d at 452-53.

The government directs the court to the Supreme Court's decision in *Hudson v. Palmer*, 468 U.S. 517 (1984), wherein the Court held that the "Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells."  *Hudson v. Palmer*, 468 U.S. 517, 530 (1984).  However, in that case, the Court first recognized that "prisons are not beyond the reach of the Constitution" and "prisoners [must] be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Id.* at 523; *see also*

---

[1] Granted, the canon is not always applicable.  "It has been also said, that the same words have not necessarily the same meaning attached to them when found in different parts of the same instrument:  their meaning is controlled by the context.  This is undoubtedly true.  In common language the same word has various meanings, and the peculiar sense in which it is used in any sentence is to be determined by the context." *Cherokee Nation v. Georgia,* 30 U.S. 1, 19 (1831).  However, amongst the First, Second, and Fourth Amendments, the context is the same—the codification of certain pre-existing rights.  *See Heller,* 554 U.S. at 592 (emphasis in original) ("[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right.").

[2] Further, felon disenfranchisement from voting may be distinguished as the Fourteenth Amendment contemplates abridgement of the right to vote "for participation in rebellion, or other crime."  U.S. CONST. XIV, § 2.  The Second Amendment includes no similar provision. *Kanter,* 919 F.3d at 452-53.

*id.* at 524 (recognizing the "persons imprisoned for crime enjoy many protections of the Constitution").  Thus, the Court's holding that the Fourth Amendment did not apply to an incarcerated person's prison cell turned, not on status as a person convicted of a crime, but, rather, on the legitimacy of the expectation of privacy in *a prison* and the institution's concomitant need to ensure security.  *See id*. at 527 ("Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests.  The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell."); *see also Nueslein v. District of Columbia*, 115 F.2d 690, 696 (D.C. 1940) ("While the IVth Amendment applies to the innocent, the misdemeanants, and the felons, what is an unreasonable search" depends on various factors.).  Thus, it is clear that convicted felons, including those still incarcerated, are not categorically excluded from "the people" as contemplated by the Fourth Amendment.

Likewise, the First Amendment's categorical exclusions depend, not on the speaker, but on the nature of the speech itself.  *See* David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 Tenn. L. Rev. 417, 470 (2020); Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 413-21 (2009); *see also Miller v. California*, 413 U.S. 15, 23 (1973) ("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.").

Accordingly, it is clear that convicted felons fall within "the people" as contemplated by the First and Fourth Amendments.  Based on existing precedent and well-established canons of construction, the court declines to carve out felons from the scope of the Second Amendment's protection of "the people."

The parties do not dispute that the Glock .45 caliber pistol constitutes an "arm" within the

Second Amendment's protection.  Nor is there any dispute that, by possessing the pistol, he "kept" the weapon.  *See Heller,* 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' as an individual right unconnected with militia service.").  Thus, the Second Amendment presumptively protects Mr. Coombes' conduct and the government must "justify [§ 922(g)(1)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

B.      Historical Tradition of Firearm Regulation

Although the Second Amendment undoubtedly codified a pre-existing right, *Heller,* 554 U.S. at 592, the right was not unlimited.  *Heller,* 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited.").  As recognized by the Supreme Court:

> [t]he law is perfectly well settled that the first 10 amendments to the constitution, commonly known as the "Bill of Rights," were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case.  In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed.

*Robertson v. Baldwin,* 165 U.S. 275, 281 (1897).  Thus, looking to the historical evidence, the court considers whether the government has satisfied its burden to demonstrate that felons constitute a "well-recognized exception" to the Second Amendment's protection—that is, whether prohibition of possession by felons is consistent with historical regulations.[3]

---

[3] The court is mindful that, in considering whether an "exception" exists, the inquiry could be construed as a relitigation of whether Mr. Coombes qualifies as "the people" such that he is presumptively entitled to the Second Amendment's protection.  However, under *Bruen*, at this step, the inquiry is not whether Mr. Coombes fall within the scope of the Second Amendment's protection of the "right of the people."  The court has already answered that question—he does.  Rather, the relevant question is whether regulations that wholly prohibit possession of a firearm by a felon are consistent with the historical tradition of firearm regulation.

The court looks to historical sources from the American Colonies and early Republic. Some American Colonies initially adopted the concept of attainder, which could result in the forfeiture of property and loss of civil rights. Special Project, *The Collateral Consequences of a Criminal Conviction*, 23 Vand. L. Rev. 929, 949, 1080 (1970). Bills of attainder were specifically applied to disarm the "disaffected" and "delinquents"—that is, Tories and those not associated with either side. *See* 1 *Journals of the Provincial Congress, Provincial Convention, Committee of Safety and Council of Safety of the State of New York: 1775-1776-1777,* 149-50 (1842); *see also* Henry Onderdonk, Jr., *Documents and Letters Intended to Illustrate the Revolutionary Incidents of Queens County with Connecting Narratives, Explanatory Notes, and Additions*, 42-44 (1846); Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms,* 117-18 (updated ed. 2008).

"[I]n classical republican political philosophy, the concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen.'" Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (quoting Don B. Kates Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also* Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) (internal footnotes omitted) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); *Binderup v. Attorney General*, 836 F.3d 336, 348-49 (3d Cir. 2016); *United States v. Yancey,* 621 F.3d 681, 684-85 (7th Cir. 2010) (suggesting that the Second Amendment was limited to "virtuous" persons). In colonial New York, the "disaffected" were "guilty of a breach of the

General Association" and outside of protection of "all the blessings resulting from that liberty which they in the day of trial had abandoned, and in defence of which many of their *more virtuous* neighbors and countrymen had nobly died." Onderdonk, *supra*, 42-44 (emphasis added). Thus, colonial bills of attainder indicate that "the founders conceived of the right to bear arms as belonging only to virtuous citizens." *Kanter*, 919 F.3d at 446.

Although not "historical twins" to § 922(g)(1), the attainder statutes are sufficient "historical analogues" as they reflect regulations designed to protect the virtuous citizenry—the "why"—through disarmament of the less virtuous—the "how." *See Bruen*, 142 S. Ct. at 2132-33 ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."); Onderdonk, *supra*, at 44 (noting that "those who refuse to defend their country should be excluded from its protection and prevented from doing injury").

Additionally, in the province of New York, persons convicted of a felony could not own property or chattels. Note, *Restoring the Ex-Offender's Right to Vote: Background and Developments*, 11 Am. Crim. L. Rev. 721, 725 n.33 (1973) (citing Julius Goebel, Jr. & T. Raymond Naughton, *Law Enforcement in Colonial New York*, 718-19 (1944)); *see also* 1 *The Colonial Laws of New York from the Year 1664 to the Revolution*, 145 (1894). Because felons were broadly precluded from possessing property, it is implicit that they could not possess a firearm.

After independence, the Bill of Rights, including the Second Amendment, was adopted in 1791. *Bruen*, 142 S. Ct. at 2137. Prior to its adoption, however, three proposals were made during the states' constitutional ratification conventions that provide insight into historical firearm restrictions on felons.

First, the Pennsylvania Anti-Federalists, who were in the minority of their state, proposed a constitutional amendment providing "[t]hat the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game" and that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals."  2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, 665 (1971) (emphasis added).  Justice Scalia referred to the minority Pennsylvania proposal as "highly influential," *Heller,* 554 U.S. at 604, likely because "it represents the view of the Anti-federalists—the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights."  *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010).  "Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited—particularly from those who had committed crimes or were a danger to the public."  *Id*.

Second, Samuel Adams proposed a similar amendment to the Massachusetts ratifying convention "that would have precluded the Constitution from ever being 'construed' to 'prevent the people of the United States, who are peaceable citizens, from keeping their own arms."  *Heller,* 554 U.S. at 716 (Breyer, J., dissenting) (citing 6 *Documentary History of the Ratification of the Constitution/* 1453 (J. Kaminski & G. Saladino eds. 2000)); *see also* 2 Schwartz, *supra*, at 674-75; Halbrook, *The Founders' Second Amendment, supra,* at 206 (of Adams' proposal stating, "the right to keep arms extended only to 'peaceable citizens,' not to criminals").  Although the proposed amendment was ultimately rejected, it too reflects the view that the state possessed the right to prohibit those who had committed prior bad acts from keeping a firearm.

Third, during the New Hampshire constitutional convention, delegates voted to recommend a proposed amendment providing that "Congress shall never disarm any citizen, unless

such as are or have been in actual rebellion."  1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 326 (1836).

Construed together, these proposals indicate that "the Founders [did not] consider[] felons within the common law right to arms or intend[] to confer any such right upon them."  Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 Mich. L. Rev. 204, 266 (1984).  "'[C]rimes committed'—violent or not—were thus an independent ground for exclusion from the right to keep and bear arms."  *Binderup*, 836 F.3d at 349.

It has been suggested that the aforementioned proposals are not persuasive because they failed.  *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:  District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374-75 (2009).  However, the failure of the proposed amendments was not because early Americans objected to the limitations on the right to bear arms included therein.  Rather, the failure of the proposed amendments is properly attributed to a lack of support by Federalists, who were in the majority in some early ratifying states, for inclusion of a bill of rights as a whole.  *See* Halbrook, *supra,* chs. 8-11.  Ultimately, inclusion of the Bill of Rights won the day.  Likewise, although some scholars have pointed out that the Second Amendment as ratified did not explicitly limit the right to virtuous or peaceable persons or exclude felons, other scholars have suggested that no objection was made because the exclusions were understood.  *See* Halbrook, *supra,* at 273 ("Samuel Adams and the drafters of the New Hampshire proposal did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms, because this too was understood.").  Thus, the three proposals made during the states' constitutional ratification conventions are persuasive historical evidence.

Other historical evidence from the period indicates that regulations prohibiting firearms to those convicted of crimes were consistent with the understanding of the early Americans who

adopted the Constitution.  *See generally Bruen*, 142 S. Ct. at 2136.  The Virginia Constitution of 1776 proposed by Thomas Jefferson provided "[n]o *freeman* shall ever be debarred the use of arms."  1 *The Papers of Thomas Jefferson Digital Edition,* 344 (James P. McClure and J. Jefferson Looney, eds. 2008-2022), https://rotunda.upress.virginia.edu/founders/TSJN-01-01-01-0002 [last accessed Sept. 12, 2022] (emphasis added).   At the time, "freeman" referred to persons who enjoyed particular liberties or privileges.  Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) ("One at liberty, and not under the command of another; but commonly is apply'd to Members of Corporations, Cities, &c. that have particular privileges belonging to them."); William Perry, *The Synonymous, Etymological, and Pronouncing English Dictionary* (1805) ("one not a slave, not a vassal; one who partakes of the rights, privileges, and immunities of a corporate body, a citizen, a  denizen, one enfranchised, one naturalized); Noah Webster, *An American Dictionary of the English Language*, 359 (1845) ("1.  One who enjoys a liberty, or who is not subject to the will of another; one not a slave or vassal.  2.  One who enjoys or is entitled to a franchise or peculiar privilege.").  1 John Ash, *The New and Complete Dictionary of the English Language* (1775) ("A man who enjoys his freedom, a man who is not a slave, a man who has a right to the privileges of a corporate body.").  The draft Virginia Constitution provides a relevant historical analogue, as it contemplates that those who had been subject to revocation of certain societal privileges, including disenfranchisement, should be excluded from the right to bear arms.   Further, Jefferson's proposal bears upon the court's interpretation of post-enactment historical evidence.

In 1871, commentator Thomas Cooley considered the nature of "the people" as used in the Constitution, stating, "[c]ertain classes have been almost universally excluded . . . the felon, on

obvious grounds."[4]  Thomas M. Cooley, *A Treatise on the Constitutional Limitations*, 29 (2d ed. 1871).[5]  Mr. Coombes urges the court to reject this evidence, contending that it is specific to voting rights.  However, the discussion should not be so narrowly construed, as Justice Cooley was discussing "the people" in whom rights and sovereignty are vested.  Further, the right to vote and the right to bear arms are closely intertwined.  *See* Reynolds, *supra*, at 480-81 ("[T]he franchise and the right to arms were 'intimately linked' in the minds of the Framers and of prior and subsequent republican thinkers."); Blocher, *supra*, at 379 ("[T]he First and Second Amendments have often been considered close cousins."); *Bruen*, 142 S. Ct. at 2131 (applying First Amendment principles to Second Amendment); *see generally* Kopel, 84 Tenn. L. Rev. 417.[6]

Based on the foregoing, the government has satisfied its burden to put forth historical evidence that the people who adopted the Second Amendment would have understood it to permit prohibition of the possession of firearms by felons.  *Bruen,* 142 S. Ct. at 2136.  Thus, § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation" and the statute is not unconstitutional.  *Id.* at 2130.

Moreover, the Supreme Court's dicta in *Heller* and *McDonald* arguably bind this district

---

[4] As recognized in both *Heller* and *Bruen*, "evidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'"  *Bruen,* 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605).

[5] The court has previously concluded that Mr. Coombes falls within "the People."  However, the court considers Mr. Cooley's treatise insofar as it reflects the historical understanding that the government may regulate and restrict the exercise of certain constitutional rights by felons.

[6] In this regard, it is significant that "[e]leven state constitutions adopted between 1776 and 1821 denied voting rights to convicted felons or authorized their state legislatures to do so."  Note, *Restoring the Ex-Offender's Right to Vote: Background and Developments*, 11 Am. Crim. L. Rev. 721, 725 n.33 (1973) (citing VA. CONST. art. 3, § 1 (1776); KY. CONST. art. 8, § 8 (1799); OHIO CONST. art. 4, § 4 (1802); LA. CONST. art. 6, § 4 (1812); IND. CONST. art. 6, § 4 (1816); MISS. CONST. art. 6, § 5 (1817); CONN. CONST. art. 6, § 2 (1818); ILL. CONST. art. 2, § 30 (1818); ALA. CONST. art. 6, § 5 (1819); MO. CONST. art. 3, § 14 (1820); N.Y. CONST. art. 2, § 2 (1821)).

court.  In *Heller*, the Court stated, "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626.  Rather, the Court characterized the regulations as "presumptively lawful." *Id.* at 627 n.26.  Thereafter, in *McDonald*, the Court "repeat[ed] [*Heller*'s] assurances," that nothing in its holding was to cast doubt on long-standing regulatory prohibitions on possession of firearms by felons and the mentally ill.  *McDonald*, 561 U.S. at 786; *see also Bruen*, 142 S. Ct. at 2157 and 2162 (Alito, J., concurring, and Kavanaugh, J., concurring).  The Supreme Court's comments in this regard have been characterized as mere dicta.  However, lower courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."  *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)); *see also United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (Tymkovich, J., concurring).

Mr. Coombes contends that the Supreme Court's statements should be disregarded in the wake of *Bruen*, noting that "the Court in *Bruen* did *not* instruct lower courts to avoid reading its opinion as casting doubt on felon disarmament laws, like § 922(g)(1)."  [Doc. 15, pp. 20-22 (emphasis in original)].  However, this court is hesitant to read too much into the Court's silence.  Notably, the *Bruen* majority did not abrogate its prior statements in *Heller* and *McDonald*.  And, although Mr. Coombes criticizes the characterization of the prohibition as "long-standing" absent a historical analysis, the Court identified the prohibition as "presumptively lawful."  *Heller*, 554 U.S. at 627 n.26.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional

enactment only upon a plain showing that Congress has exceeded its constitutional bounds."); *United States v. Plotts,* 347 F.3d 873, 877 (10th Cir. 2003) ("Statutes are presumed constitutional.").

Significantly, in *Bruen*, it was undisputed that the petitioners were "law-abiding" and not felons. *Bruen,* 142 S. Ct. at 2134. Thus, the Court had no occasion to consider the continued validity of any "presumptively" constitutional limitations. In fact, the majority's holding suggests the continuing viability of some regulations as, without conducting a historical analysis, the Court stated:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall issue" licensing regimes, under which a general desire for self-defense is sufficient to obtain a [permit]. Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.

*Bruen,* 142 S. Ct. at 2138 n.9 (internal quotations and citations omitted). "Licensing requirements mandate that gun owners meet certain standards or pass certain tests before owning guns or using them in particular ways." *Heller v. District of Columbia,* 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). By indicating that the "shall issue" regimes—which require potential gun owners to satisfy certain standards to ensure that they "are, in fact, law-abiding, responsible citizens"—are constitutional without performing a historical analysis, the majority opinion in *Bruen* suggests the continued presumptive validity of certain firearm regulations designed to ensure that the gunowner is "law-abiding." The concurring opinions of Justices Alito and Kavanaugh, in which Chief Justice Roberts joined, provide further support for the continuing validity of certain presumptively constitutional regulations, even in the wake of *Bruen*. *See Bruen*,

142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. . . .  Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns.").

> [A]s *Heller* and *McDonald* established and the Court today again explains, the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check.  Properly interpreted, the Second Amendment allows a "variety" of gun regulations.  As Justice Scalia wrote in his opinion for the Court in *Heller*, and Justice Alito reiterated in relevant part in the principal opinion in *McDonald*:
>
> > Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. . . . [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . .  [Footnote 26: We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive.].

*Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring).  Thus, for this additional reason, Mr. Coombes' facial challenge to § 922(g)(1) is denied.

## IV.    As-Applied Challenge

Mr. Coombes also brings an "as-applied" challenge to § 922(g)(1).  The distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).  "[I]t does not speak at all to the substantive rule of law necessary to establish a constitutional violation," and therefore the same substantive constitutional analysis applies. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *see also Gross v. United States,* 771 F.3d 10, 14-15 (D.C. Cir. 2014) ("[T]he substantive rule of law is the same for both challenges.").  Accordingly, the court must consider whether § 922(g)(1), as applied to Mr. Coombes, is consistent with the Second Amendment's text and

historical understanding. *Bruen,* 142 S. Ct. at 2131.

Mr. Coombes argues that § 922(g)(1) is unconstitutional as applied to him because (although not conceding the point) felon disarmament laws can only be constitutional as applied to those with violent felony convictions, and Mr. Coombes' prior felony convictions were all nonviolent.[7]  [Doc. 15, p. 23].  Assuming that § 922(g)(1) applies only to violent crimes, as previously stated, Mr. Coombes was previously convicted of Burglary in Second Degree pursuant to Okla. Stat. tit. 21, § 1435, and Grand Larceny in a House or Vessel pursuant to Okla. Stat. tit. 21, § 1707.  In the briefs, Mr. Coombes concedes that he broke into a house "he knew to be unoccupied" and stole some guitars.  [Doc. 15, p. 7].  Thus, the court considers whether applying § 922(g)(1) to a person convicted of Second Degree Burglary and Grand Larceny, both of a house, is consistent with the Second Amendment's historical understanding.

Burglary was a felony at common law.  *See* 4 William Blackstone, *Commentaries,* *228; *Jerome v. United States*, 318 U.S. 101, 109 n.6 (1943).  The benefit of clergy was inapplicable and burglary was punishable by death.  4 William Blackstone, *Commentaries,* **227-28; John Hostettler, *A History of Criminal Justice in England and Wales*, 76 (2009).  This was true regardless of whether the home was occupied or unoccupied.  4 William Blackstone, *Commentaries*, *228 ("A house however, wherein a man sometimes resides, and which the owner hath only left for a short reason . . . is the object of burglary; though no one be in it, at the time of the fact committed."); 3 Wayne R. LaFave, *Substantive Criminal Law*, 277 (3d ed. 2018) ("If the place is one of human habitation, there is no requirement that a person be present therein at the

---

[7] Mr. Coombes also argues that there is no way to sever violent from non-violent felonies pursuant to the plain language of § 922(g) and any such interpretation would be unconstitutionally vague. [Doc. 15, pp. 24-25].  However, these arguments are foreclosed by the court's conclusion that § 922(g) is facially constitutional.

time of the offense."). This is because burglary "ha[d] always been looked upon as a very heinous offence: not only because of the abundant terror that it naturally carries with it, but also as it is a forcible invasion and disturbance of that right of habitation." 4 William Blackstone, *Commentaries*, \*223.

American colonial penal codes also criminalized burglary. Early statutes characterized burglary as a felony punishable by death, branding, or mutilation. *See, e.g.,* 3 *Pa. Stats. at Large*, 203-04 (1712 to 1724); *Acts & Laws of His Majesty's Province of New Hampshire in New England*, 15 (Daniel Fowler 1761); *Acts & Laws of His Majesties Colony of Connecticut in New England*, 249-50 (May 1716 to May 1749); *Acts and Laws of His Majesty's Province of the Massachusetts Bay in New England*, 10 (1726); *see also* 1 *Laws of the State of Delaware From October 14, 1700 to August 18, 1797*, 296-97 (Samuel & John Adams 1797) (larceny punished by mutilation and death for third offense). Such punishments were reserved for serious offenses. *See* Steven A. Hatfield, *Criminal Punishment in America: From the Colonial to the Modern Era*, 1 U.S. Air Force Acad. J. of Legal Studies 139, 145 (1990).

In the years after the adoption of the Second Amendment, courts recognized "[h]ouse-breaking with a felonious intent has always been considered a crime of an aggravated nature; if committed in the night time, it has been, both in England and in this country, a capital offence." *Commonwealth v. Hope*, 39 Mass. 1, 4 (Mass. 1839). And modern authorities continue to recognize the violent nature of burglary, as 18 U.S.C. § 924(e) included burglary in its definition of "violent felony." *See also Taylor v. United States*, 495 U.S. 575 (1990). Thus, both the legislative and judicial history of this country demonstrate a long-standing tradition of treating burglary as a crime of violence. *See generally* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019). Because Mr. Coombes has been convicted of burglary, which was

considered a violent crime, assuming that § 922(g)(1) is constitutionally limited to violent crimes, the statute is not unconstitutional as applied to Mr. Coombes.

## V.   Equal Protection Challenge

Mr. Coombes also contends that § 922(g)(1) violates the Equal Protection component of the Fifth Amendment because the statute is not "narrowly tailored to advance a compelling state interest" and therefore it does not satisfy strict scrutiny.  [Doc. 15, pp. 25-26].  The court is not persuaded.

Mr. Coombes contends that, because the right to bear arms is a fundamental right, the government "bears the burden of proof on strict scrutiny, under which 'discrimination can be justified only if it is narrowly tailored to achieve a compelling state interest.'"  *Ashaheed v. Currington,* 7 F.4th 1236, 1251 (10th Cir. 2021).  However, as discussed above, in *Bruen*, the Court explicitly rejected "means-end" scrutiny in favor of the historical approach.  *Bruen*, 142 S. Ct. at 2126-30.  As previously stated, pursuant to the "means-end" test, if a "core" Second Amendment right was burdened, courts applied strict scrutiny.  *Id.* at 2126.  Otherwise, intermediate scrutiny applied.  *Id.* at 2126-27.  In rejecting any balancing test, the Court reasoned, "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.  It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen,* 142 S. Ct. at 2131 (internal citation omitted) (emphasis in original) (quoting *Heller*, 554 U.S. at 635).  Thus, application of strict scrutiny pursuant to the Fifth Amendment's equal protection clause is inconsistent with *Bruen*.  Rather, "the Second Amendment analysis is sufficient to protect these rights" and a separate equal protection analysis is unnecessary. *See Sibley v. Watches,* 460 F. Supp. 3d 302, 318 (W.D.N.Y. 2020).

Further, as discussed above, in *Heller*, the Court stated, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," *Heller,* 554 U.S. at 626, and characterized the regulations as "presumptively lawful." *Id.* at 627 n.26.  The *Bruen* Court did not abrogate or call these statements into question.  Further, *Bruen* did not involve an Equal Protection challenge.  Prior to *Bruen,* courts had upheld § 922(g)(1) against equal protection challenges.  *See, e.g., United States v. Jester,* 139 F.3d 1168 (7th Cir. 1998); *United States v. Meldish,* 722 F.2d 26, 28 (2d Cir. 1983).  Under the circumstances, these cases remain persuasive.  Thus, § 922(g)(1) does not violate the Fifth Amendment's equal protection clause and Mr. Coombes' motion to dismiss on this basis must be denied.

## VI.    Conclusion

WHEREFORE, the Motion to Dismiss the Indictment for Failure to State an Offense [Doc. 15] of defendant Jacob William Paul Coombes is denied.

IT IS SO ORDERED this 21st day of September, 2022.

GREGORY C. FRIZZELL
UNITED STATES DISTRICT JUDGE

- 22 -